IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DOROTHY GROVES,               )
                              )
                              )
        v.                    )        No. 3:04-0966
                              )
MICHAEL J. ASTRUE,            )
Commissioner of Social Security[1]  )

To:  The Honorable John T. Nixon, Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Secretary of Health and Human Services denying Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform an unskilled, light level of work and, therefore, other substantial gainful activity during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 10) should be denied.

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

# I. INTRODUCTION

The plaintiff filed an application for DIB on July 16, 2000, alleging disability due to problems with her feet, legs, kidneys, and nerves; heartburn; difficulty sleeping; and being overweight with an onset date of May 3, 1996. (Tr. 169-71, 187.) The plaintiff's alleged onset date was amended to August 24, 1999.[2] Docket Entry No. 11, at 1-2. The plaintiff's current claim was denied initially and upon reconsideration. (Tr. 152, 158.) A hearing was held before Administrative Law Judge ("ALJ") John P. Garner on November 19, 2002. (Tr. 37-84.) The ALJ delivered an unfavorable decision on January 31, 2003 (Tr. 21-29), and the plaintiff petitioned for a review of that decision before the Appeals Council. (Tr. 16.) The Appeals Council denied the plaintiff's request for review of that decision on August 21, 2004 (Tr. 4-6), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on April 17, 1950, and was 52 years old at the time of the hearing before the ALJ. (Tr. 169.) The plaintiff completed school through the sixth grade. (Tr. 253-54.) Although her educational records indicate a pattern of sparse attendance and poor performance, the administrative record does not contain any information as to whether the plaintiff attended special

---

[2] The plaintiff filed a prior application for DIB on January 31, 1997. Docket Entry No. 11, at 1-2. This claim was denied initially and upon reconsideration. *Id.* The ALJ delivered an unfavorable opinion on August 23, 1999, and the Appeals Council denied the plaintiff's request for review on May 17, 2001. *Id.* Since the plaintiff took no further action on this decision, the Commissioner is bound by the ALJ's decision issued on August 23, 1999. *See Cottrell v. Sullivan*, F.2d 342, 343-44 (6th Cir. 1992). Even though the outcome of the plaintiff's earlier application is not at issue here, it is relevant because the onset date cannot be earlier than August 24, 1999. *Id.*

Case 3:04-cv-00966   Document 21   Filed 08/11/09   Page 2 of 32 PageID #: 5

education classes.[3] *Id.*  The plaintiff worked seasonally for over 20 years at a Sunbeam lawn furniture factory, strapping plastic weaving to the lawn furniture.[4] *Id.*

### A. Chronological Background: Procedural Developments and Medical Records

Prior to the alleged onset date**,** the plaintiff presented to Dr. John Taylor on May 20, 1988, for ankle pain and swelling. (Tr. 271.)  Over the course of several years, Dr. Taylor treated the plaintiff for swelling in her right leg, mild arthritis, sleeplessness, hypertension, neck pain, and edema. (Tr. 258-71.)  The plaintiff also sought medical treatment for pain and swelling in her left shoulder at the Tennessee Christian Medical Center from December 31, 1996, to March 11, 1997.[5] (Tr. 272-83.)  After multiple physical therapy sessions, Dr. Jane Siegel opined that the plaintiff's strength and range of motion had improved, and that her pain and edema had decreased. (Tr. 275, 277.)

On July 26, 1998, Dr. David Stewart, a general practitioner, treated the plaintiff for chronic edema of both lower extremities. Exhibit A to Docket Entry No. 11.  Although Dr. Stewart's medical report was part of the original record and was reviewed by the ALJ (Tr. 22),  it was not included in the original administrative record in this case.  However, upon the plaintiff's unopposed motion and court order, the defendant filed the medical report as a correction to the record. *See* Docket Entry

---

[3] At the hearing before the ALJ, the plaintiff's attorney stated that the plaintiff was uncertain of whether she had attended special education classes. (Tr. 41.)

[4] The same factory was also referred to as "Almat [phonetic] Lawn White Products."  (Tr. 40.)

[5] A physical therapist diagnosed the plaintiff with "frozen shoulder." (Tr. 282.)

-3-

No. 17.  Dr. Stewart diagnosed the plaintiff with post-phlebitic syndrome,[6] a condition resulting

from chronic venous insufficiency, especially of the right calf, with chronic edema.  The plaintiff

also had a "substitution of the subcutaneous fat with fibrous tissue," causing the skin between her

knee and lower leg to be extremely hard, and "multiple small dilated superficial varices" in her right

calf. *Id*.  The plaintiff experienced numbness and tingling in her lower extremities, but she did not

have pain.  *Id*.  Due to these conditions, the plaintiff's legs swelled considerably when she stood.

*Id.*  Dr. Stewart opined that "there was no cure in sight for [the plaintiff] and that [the plaintiff] needs

to have either almost constant heel over heart elevation or at least [wear] constant[ly] compression

hose during the day." *Id*.  He also advised the plaintiff "to wear [compression hose] all day long,

every day," and he did not recommend medication because he believed it would be "of no

appreciable benefit." *Id*.

Dr. Linda Blazina, Ph.D., a consultative psychologist, examined the plaintiff on October 14,

1998. (Tr. 119.)  Dr. Blazina noted that the plaintiff's "hygiene was inadequate and that she had a

noticeable body odor," that the plaintiff could not drive, and that her parents assisted her with

transportation and finances. (Tr. 119-20.)  Dr. Blazina administered the Wechsler Adult Intelligence

Scale-Third Edition ("WAIS-III"), a common intelligence test. (Tr. 121.)  The plaintiff's verbal IQ

was 78, her Performance IQ was 75, and her full scale IQ was 75. *Id.*  Dr. Blazina opined that the

plaintiff's intellectual capability was limited but that she was functioning within the borderline

range; her ability to understand, remember, and sustain concentration and persistence "did not

appear significantly limited;" and her social interaction and adaptation abilities were "mildly

---

[6] Post-phlebetic syndrome consists of ulcerations that are "usually small, superficial, and
very painful because of exposure to nerve endings." The Merck Manual 591 (Robert Berkow et al.
eds., 16th ed. 1992).

Case 3:04-cv-00966   Document 21   Filed 08/11/09   Page 4 of 32 PageID #: 7

limited" and "limited," respectively, due to "borderline intellectual functioning and possible dependent personality traits." (Tr.121-23.) Dr. Blazina assigned the plaintiff a Global Assessment of Functioning ("GAF") score of 60 to 65.[7] (Tr. 122.)

The plaintiff also regularly visited Dr. Albert Dittes, and his successor, Dr. Lu Ponce, from May 28, 1995, to July 17, 2006.[8] (Tr. 284-310.)  Although the Court had difficulty deciphering the handwriting in the physicians' progress notes, on July 20, 1998, Dr. Dittes completed a physical capacity evaluation of the plaintiff and concluded that she was able to perform "[l]ess than a full range of sedentary work." (Tr. 302.)  In a letter written on the same day, Dr. Dittes indicated that the plaintiff "is disabled for work" because of chronic back pain, right leg phlebitis, and a chronic urinary tract infection. (Tr. 301.)  On October 19, 1999, Dr. Dittes diagnosed the plaintiff with arthritis in her knees and "urinary urgency." (Tr. 296.)  The plaintiff returned to Dr. Dittes on January 1, 2000, after twisting her left ankle. (Tr. 295.)   On March 22, 2000, the plaintiff experienced swelling in her legs and feet, and she was diagnosed with post phlebitis of the right leg and stasis dermatitis. (Tr. 294.)

Dr. Dittes compiled two Medical Assessments of the plaintiff's Ability to do Work-Related Activities ("Medical Assessment"). (Tr. 285-90.)   In the June 7, 1999, Medical Assessment Dr. Dittes found that the plaintiff was able to lift/carry "very little" in an eight hour work day due

---

[7] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR").  A GAF score of 60 to 65 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning," and "[s]ome mild symptoms [or] some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

[8] Dr. Dittes retired at some point between June 25, 1999, and July 17, 2000, and Dr. Ponce became the plaintiff's internist. Docket Entry No. 11, at 3.

to spasms in her lumbar muscles; stand/walk for two hours, with only one hour uninterrupted, in an eight hour work day due to foot and back pain; and sit for three hours, with two hours uninterrupted, in an eight hour work day. (Tr. 288-89.)  Dr. Dittes limited the plaintiff's ability to climb, balance, stoop, and crouch to "occasionally," and her ability to kneel and crawl to "never." (Tr. 289.)  He indicated that reaching was affected by the plaintiff's back pain, and restricted her ability to be around heights, moving machinery, temperature extremes, dust, noise, fumes, humidity, and vibration. (Tr. 289-90.)  Dr. Dittes also noted that "[b]ending over to pick up objects and step[ping] up to steps bother[ed] her." (Tr. 290.)  Nearly two weeks later Dr. Dittes completed a second Medical Assessment on the plaintiff and arrived at the same conclusions as he had in his first Medical Assessment. (Tr. 285-87.)

Upon referral from Dr. Ponce, the plaintiff saw Dr. John Edwards at the Vanderbilt University Medical Center ("VUMC") on January 20, 2000, with the same right ankle fracture for which she had seen Dr. Dittes, and he placed her in a "short-leg walking cast."[9] (Tr. 320-22.)  The plaintiff returned to Dr. Edwards on February 10, 2000, and again on March 2, 2000.  X-rays indicated that the plaintiff's fracture was healing properly. (Tr. 316-19.)  By March 16, 2000, the plaintiff's ankle fracture had completely healed, but Dr. Edwards found a pretibial edema on her right leg and a pitting edema on her left leg. (Tr. 314.)  X-rays taken on July 20, 2000, showed minor patellofemoral spurring, considerable soft tissue swelling around the right ankle, mid-foot spurring, and "os calcis spurring." (Tr. 312-13.)

---

[9] The VUMC medical reports sometimes erroneously refer to a left ankle fracture, but the plaintiff fractured her right ankle. (Tr. 314.)

Case 3:04-cv-00966   Document 21   Filed 08/11/09   Page 6 of 32 PageID #: 9

On October 2, 2000, Dr. William O'Brien, Psy. D., performed a consultative mental status examination. (Tr. 323-27.) Dr. O'Brien noted that the plaintiff "is able to dust, prepare simple meals, make food and clothing purchases, wash dishes, and do laundry." (Tr. 325.) The plaintiff reported that she "refrains from activities that involve sweeping, mopping, vacuuming, yard work, or performing simple household repairs . . . ." *Id.* Dr. O'Brien assigned the plaintiff a Full Scale IQ score of 69, placing her functioning ability in the "Extremely Low Range," a verbal IQ score of 73, and a performance IQ score of 70 on the WAIS-III. *Id.* Dr. O'Brien opined that even though the plaintiff "obtained a Full Scale IQ score within the Extremely Low range, both her lack of educational opportunity and adaptive functioning argues against a diagnosis of Mild Mental Retardation." (Tr. 326.) He also noted that the plaintiff's arthritis "interfered with her ability to perform on speeded tests." *Id*. Dr. O'Brien diagnosed the plaintiff with an "Adjustment Disorder with Depressed Mood" and "Borderline Intellectual Functioning," but he did not assign any significant limitations to the plaintiff's ability "to sustain concentration, remember simple instructions, make plans independently of others, maintain basic standards of neatness/cleanliness, socially interact on a repeated basis, accept instruction/criticism from others, work with others, or in her ability to manage funds." *Id*.

Dr. Albert Gomez, a consultative internist, conducted a physical examination of the plaintiff on October 4, 2000 (Tr. 328-30), and found that she had a "2+ pitting brawny pedal edema bilaterally," full range of motion in her right shoulder, and "moderate tenderness to palpation" with mildly decreased range of motion in her left shoulder. (Tr. 329.) He noted that the plaintiff had "moderate tenderness to palpation to both hip joints," decreased left knee flexion with normal extension in both knees, moderate varicose veins in both legs, and moderate edema in her right ankle

-7-

"with moderate tenderness to palpation" and a decreased range of motion, but that her the left ankle had a full range of motion. *Id.* Dr. Gomez observed that the plaintiff had full motor strength with good hand grip bilaterally in the plaintiff's upper and lower extremities, "moderate tenderness to palpation of the cervical spine," and "mild tenderness to palpation of the lumbosacral spine" with mildly decreased range of motion. *Id.* Dr. Gomez diagnosed the plaintiff with degenerative joint disease with chronic knee and ankle pain, obesity,[10] varicose veins with "pedal edema," and a history of depression. (Tr. 330.) Dr. Gomez opined that in an eight hour workday the plaintiff could lift 20 pounds occasionally, and that she could stand/sit at least six hours with normal breaks. *Id.*

On October 19, 2000, Dr. Ed Sachs, Ph.D., presumably a non-examining consultative psychologist, completed a Psychiatric Review Technique Form ("PRTF") (Tr. 331-44) and found that the plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 341.) Dr. Sachs also completed a mental residual functional capacity ("RFC") assessment (Tr. 345-47) and determined that the plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; in her "ability to maintain attention and concentration for extended periods;" and in her "ability to complete a normal workday and workweek." (Tr. 345-46.) He opined that the plaintiff could "perform simple and low level determined tasks over [a] full work week." (Tr. 347.)

Dr. Helena P. Perry, a non-examining consultative physician, completed a physical RFC on October 25, 2000 (Tr. 349-56), and opined that the plaintiff could lift/carry 10 pounds frequently and 20 pounds occasionally, stand/walk and sit about six hours in an eight hour workday, and had

_____

[10] The plaintiff was 68 inches tall and a weighed 263 pounds. (Tr. 329.)

-8-

unlimited pushing/pulling ability. (Tr. 350.)  Dr. Perry  noted that the plaintiff had no visual, communicative, or environmental limitations, but that she was occasionally limited in climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 351-53.)  She also determined that the plaintiff had limited reaching ability in all directions. (Tr. 352.)

On March 16, 2001, Dr. James S. Walker, Ph.D., presumably a non-examining consultative psychologist, completed a PRTF (Tr. 358-71) and found that the plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 368.) Dr. Walker also completed a mental RFC (Tr. 372-75) and determined that the plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; in her "ability to maintain attention and concentration for extended periods;" and in her "ability to complete a normal workday and workweek." (Tr. 372-73.)  He found that her ability to respond to criticism and changes in the workplace, accept instructions, and set goals or make plans was also moderately limited. (Tr. 373.) Dr. Walker noted that the plaintiff's ability to interact appropriately  with the general public was "markedly limited." *Id.*  He opined that the plaintiff could "understand/recall/perform low-level detailed instructions [and] sustain concentration, persistence and pace with occasional lapses." (Tr. 374.)  Dr. Walker concluded that the plaintiff could not "work with the general public," and would have occasional difficulty accepting criticism, but could "adapt to low level change and set short term goals." *Id.*

The plaintiff presented to Cumberland Mental Health Center ("CMHC") on December 27, 2000 (Tr. 392- 95), and on January 29, 2001, Aimee Gilliland, M.A., completed an intake summary on her.  Ms. Gilliland's clinical summary of the plaintiff noted that

-9-

> [t]hroughout the assessment, cl[ient] regularly returned to her application for disability. For example, client was very disappointed when told that the therapist would not be able to assist her with her disability claim & indicated that she really wants the doctor to be able to help her with that. [Client] may be experiencing some mild problems with anxiety, but [the] therapist was struck with her focus on obtaining disability as the driving force in her assessment and her tendency to focus on her physical ailments rather than her psychiatric issues. Based on her desire to obtain financial gain in the form of social security disability if she is successful in getting a mental health professional to plead her case coupled with her minimal cooperation during the assessment, client is given a diagnosis of Malingering (V65.2). If client does not receive the help she is seeking in terms of disability, she will probably terminate her services with CMHS.

(Tr. 393-94.) Ms. Gilliland assigned the plaintiff a GAF score of 65,[11] and indicated that she had a disheveled appearance, normal speech, blunted affect, appropriate behavior, poor recent and remote memory, poor concentration, impaired insight and judgment, and a euthymic mood. (Tr. 394-95.) On a February 7, 2001, the plaintiff returned to CMHC and was diagnosed with "Dysthymia [versus] MDE [major depressive episode], recurrent [with] anxious features." (Tr. 390.) Additionally, in contrast to Ms. Gilliland's assessment, the CMHC examiner ruled out malingering, drug seeking, and generalized anxiety disorder as potential diagnoses. *Id.*

Belying Ms. Gilliland's prediction, the plaintiff returned to CMHC on multiple occasions in 2001 and 2002. On March 21, 2001, Dr. April Beasley, a psychiatrist at CMHC, examined the plaintiff and found her to have "mild" depression, anxiety, "motoric slowing," and a "moderate" level of functioning. (Tr. 384.) Dr. Beasley also determined that the plaintiff had a subdued affect, narrow range of affect, slow speech/thought process, and normal thought content/memory. *Id.* She diagnosed the plaintiff with obsessive compulsive disorder ("OCD"), major depressive episode, and

---

[11] A GAF score of 65 falls within the range of "[s]ome mild symptoms [or] some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

-10-

Dysthymia.[12] (Tr. 385.)  The plaintiff returned to Dr. Beasley on May 2, 2001, with moderate depression and anxiety, mild "motoric slowing," and a less than slight impairment in functioning. (Tr. 383.)  Dr. Beasley also concluded that the plaintiff had a flat affect, constricted range of affect, slow speech/thought process, and normal thought content/perceptions. *Id.*  She prescribed 25 milligrams of Zoloft for the plaintiff. *Id.*  On July 12, 2001, Dr. Beasley  determined that the plaintiff's anxiety and "motoric slowing" were moderate and her level of functioning was unchanged, but her level of depression had  increased to high. (Tr. 382.)  She also opined that the plaintiff had a subdued affect, narrow range of affect, slow speech/thought process, and hallucinations. *Id.*  Dr. Beasley increased the plaintiff's Zoloft prescription to 50 milligrams. *Id.*  On August 23, 2001, Dr. Beasley rated the plaintiff's depression, anxiety, and "motor slowing" as "high," and she increased the plaintiff's dosage of Zoloft to 100 milligrams. (Tr. 381.)

Dr. Beasley evaluated the plaintiff again on January 17, 2002, and diagnosed her with OCD, major depressive disorder, Dysthymia, anxiety, obesity, and venous stasis. (Tr. 402.)  Dr. Beasley opined that the plaintiff's obsessive and compulsive symptoms had decreased, assigned her a GAF score of 60,[13] and continued to prescribe Zoloft. (Tr. 402-03.)  The plaintiff's condition remained unchanged at a March 27, 2002, treatment session. (Tr. 377.)  Dr. Beasley examined the plaintiff on April 11, 2002, and diagnosed her with OCD, major depressive disorder, and morbid obesity. (Tr. 398-400.)  Dr. Beasley assigned the plaintiff a GAF score of 42,[14] continued to prescribe Zoloft,

---

[12] Every attempt to decipher Dr. Beasley's progress notes was undertaken; however, several handwritten sections were simply illegible. (Tr. 384-86.)

[13] A GAF score of 60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning."  DSM-IV-TR at 34.

[14] A GAF score of 42 falls within the range of "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning." *Id.*

-11-

and noted that her "affect is just a bit brighter than it was on the last occasion." (Tr. 399-400.)  The plaintiff returned to Dr. Beasley on July 11, 2002, and her diagnosis, GAF score, and medications remained unchanged from her previous session. (Tr. 405-08.)  On September 4, 2002, Dr. Beasley completed a physician's statement and opined that the plaintiff's level of functioning was "fair" and that the plaintiff was not capable of maintaining employment but was capable of managing her own funds and able to live alone. (Tr. 397.)

### B. November 19, 2002, Hearing: Testimony of the Plaintiff, Plaintiff's Father, and the Vocational Expert

The plaintiff testified that she has always lived with either her parents or sister and has never lived alone. (Tr. 46.)  She reported having problems with her hand jerking, sleeping at night, repeatedly washing her hands, and compulsively moving her legs. (Tr. 46-47.)  The plaintiff revealed that although she takes medication, she is "a little slow on getting started" and occasionally "has trouble remembering to take it." (Tr. 47-48.)

The plaintiff testified that she worked at Sunbeam for over twenty years, and since she never learned how to drive a car, her father transported her to and from work daily. (Tr. 49.)  At Sunbeam, the plaintiff strapped lawn furniture chairs with plastic weaving.  (Tr. 50.)  The plaintiff explained that Sunbeam created daily production quotas for the number of chairs to be produced and that she "hardly ever got projection."  (Tr. 51.)  The plaintiff testified that the factory's production of lawn chairs was seasonal and that she was laid off for two or three months every year. (Tr. 52.)  The plaintiff reported that the job was difficult on her feet since she was required to stand throughout the workday and received minimal breaks.  (Tr. 54.)  In 1996 she took an "early layoff" because she developed swelling in her feet and a "frozen shoulder." (Tr. 53.)

-12-

The plaintiff testified that her legs are black, her feet "swell and stay swelled all the time," and that she has had persistent foot and back problems that make it difficult to sit or stand for long periods of time, and that she has difficulty walking. (Tr. 55.)  The plaintiff testified that she is able to shop for groceries and wash laundry, but that her sister does most of the housework and yard work. (Tr. 56-57.)  The plaintiff also related that her memory has deteriorated since she stopped working and explained that she has difficulty focusing and forgets to finish tasks. (Tr. 57-58.)  She stated that her mental limitations, exhibited by her substandard school work, caused her to drop out of school after completing the sixth grade at the age of sixteen. *Id.*  The plaintiff testified that she "sometimes" has difficulty reading and writing, and that she spends most of her days sitting, lying down, and watching television. (Tr. 58-60.)

Lawrence Groves, the plaintiff's father, testified that the plaintiff's inability to drive forced her parents to drive her to work and to go shopping. (Tr. 62-63.)  Mr. Groves testified that in the last eight or nine months the plaintiff's back problems had deteriorated to the extent that she could not stand for long periods of time and had great difficulty walking across her yard. (Tr. 63.)  He reported the plaintiff takes off her shoes and elevates her feet to reduce the swelling on an almost daily basis. (Tr. 64.)  Mr. Groves also testified that the plaintiff presented to Dr. Stewart[15] for foot care and that Dr. Stewart recommended that the plaintiff elevate her feet two, three, or four times a day. *Id.*  Due to these physical limitations, Mr. Groves stated that the plaintiff spends most of her time lying down and watching television. *Id.*  Mr. Groves has also noticed that the plaintiff's hands tremble and that she has become increasingly forgetful. (Tr. 65-66.)  Mr. Groves testified that the plaintiff did not have behavioral problems as a student, but that she did have some difficulty keeping up with the

---

[15] The transcriptionist phonetically spelled Dr. Stewart's name "Steer." (Tr. 64.)

-13-

assigned work. (Tr. 67.) He stated that the plaintiff secured her job at Sunbeam through her mother and that management at the factory did not discipline the plaintiff for missing production quotas. (Tr. 68-69.)

J.D. Flynn, the Vocational Expert ("VE"), testified that the plaintiff's past work as a "webbing tacker" should be classified "as heavy, as ordinarily performed, and semi-skilled, SVP [Specific Vocational Preparation] three."[16] (Tr. 69-70.) The ALJ noted that the VE's classification was based upon her working on upholstered furniture even though the plaintiff made plastic lawn furniture that weighed considerably less than upholstered furniture. (Tr. 70-71.) After some probing by the ALJ, the VE changed his initial assessment and classified the plaintiff's past work as general labor, light and unskilled. (Tr. 72.) The ALJ noted that the VE who had testified at the earlier hearing on the plaintiff's prior application opined the plaintiff could be a hand packer, assembler, or perform non-construction labor since she

> had the residual functional capacity for a limited range of light work lifting 20 pounds occasionally, ten frequently, standing and walking three to four hours out of the eight, no longer than 30 minutes at a time, sitting for six hours out of eight with limited ability -- let's say frequent use of foot pedals and controls, mild limitation on the ability to adapt to changes in the work setting, and mild limitation on social interaction particularly with the general public.

*Id.* Given those limitations, the VE testified that in Tennessee the following jobs were available that the plaintiff could perform: 3,741 sedentary assembler jobs, 449 grader and sorter jobs; 773 production inspectors, checkers, examiners jobs; and 570 packaging and filling jobs. (Tr. 73-74.)

---

[16] The SVP is "defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles 1009 (4th Ed. Rev. 1991). It is measured on a scale from 1-9 on which the higher the number assigned to a job, the greater the skill that is required to perform that job. *Id.*

-14-

The ALJ then asked, in reference to a limitation assigned by Dr. Stewart, whether the need to elevate one's feet three to four times a day would preclude one from these factory jobs. (Tr. 76.) The VE responded that if scheduled breaks could not accommodate the plaintiff's need to elevate her feet, that limitation would eliminate work. *Id.*

The ALJ asked the VE to consider the psychological evaluations of Dr. O'Brien, Dr. Sachs, and Dr. Walker, all of whom assigned moderate mental limitations to the plaintiff. (Tr. 74-76.) The VE testified that their assigned limitations would not bar the plaintiff from performing the listed jobs. *Id.* The VE also testified that a person with a GAF score in the range of 60-65 could successfully handle those jobs, but that a person with a GAF range of 30-42 would be precluded from any type of work. (Tr. 76.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on January 31, 2003. (Tr. 21-29.) Based on the record, the ALJ made the following findings:

1.  The claimant met the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through December 31, 2002.

2.  The claimant has not engaged in substantial gainful activity since August 24, 1999.

3.  The claimant has the following "severe" impairments: degenerative joint disease, obesity, borderline intellectual functioning, a depressive disorder, and obsessive compulsive disorder.

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

-15-

6.      The claimant has the residual functional capacity to lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit 6 hours in an 8 hour workday; occasionally climb, balance, stoop, kneel, crouch, crawl, or reach; with the ability to stand and/or walk 3 to 4 hours in an 8 hour workday and occasionally push or pull foot pedals and controls. There are only mild to moderate limitations in the ability to adapt to changes in a work-like setting and to interact appropriately with the general public, supervisors, and coworkers.

7.      The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

8.      Prior to April 17, 2000, the claimant was a younger individual between the ages of 45 and 49; as of April 17, 2000, at age 50, she is an individual closely approaching advanced age (20 CFR § 404.1563).

9.      The claimant has a marginal, sixth grade education (CFR § 404.1564).

10.     The claimant has no vocational skills that are transferable to other jobs (20 CFR § 404.1568).

11.     Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rules 202.10 and 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs are identified above.

12.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

(Tr. 28.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his

-16-

conclusion. 42 U.S.C.A. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is

Case 3:04-cv-00966   Document 21   Filed 08/11/09   Page 17 of 32 PageID #: 20

performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found

-18-

disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[17] *Id.* *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29

---

[17] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

Case 3:04-cv-00966   Document 21   Filed 08/11/09   Page 19 of 32 PageID #: 22

(6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The five step inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step inquiry, and he ultimately concluded that the plaintiff was not under a disability as defined by the Act. (Tr. 28.) At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since August 24, 1999. *Id.* At step two, the ALJ found that the plaintiff suffered from the severe impairments of degenerative joint disease, obesity, borderline intellectual functioning, a depressive disorder, and obsessive compulsive disorder. At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. At step four, the ALJ found that the plaintiff was unable to perform her past relevant work. *Id.* At step five, the ALJ concluded that the plaintiff retained the capacity to perform unskilled, light work that existed in significant numbers in the national economy. *Id.*

The effect of this decision was to preclude the plaintiff from receiving DIB.

-20-

**C. The plaintiff's assertions of error**

The plaintiff alleges that the ALJ erred in assessing the opinion of the plaintiff's treating physician, Dr. Beasley, in determining that her subjective complaints of pain were not credible, and in concluding that she was not mildly mentally retarded. Docket Entry No. 11, at 9-13.

### 1. The ALJ properly assessed the medical evidence of the plaintiff's treating physician.

Dr. Beasley first examined the plaintiff on March 21, 2001, and diagnosed her with "mild" depression, anxiety, "motoric slowing," and a "moderate" level of functioning. (Tr. 384.) Over an eighteen month period, the plaintiff had multiple follow-up appointments with Dr. Beasley. (Tr. 377, 380-84, 397-408) and given that regularity, she is classified as a treating source under 20 C.F.R. § 404.1502.[18] The plaintiff argues that the ALJ erred by "improperly discredit[ing] the opinions and statements" of Dr. Beasley "in favor of those given by consultative or non-examining physicians." Docket Entry No. 11, at 9.

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R.

---

[18] A treating source, defined by 20 C.F.R. § 404.1502, is

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

§ 416.927(d)(2). Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). *See also Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993) ("[The Sixth Circuit] has consistently stated that the Secretary is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence."). This is commonly known as the treating physician rule. See Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Dr. Beasley concluded that the plaintiff "was not capable of maintaining employment" (Tr. 377), but her finding was not supported by clinical or laboratory testing and was inconsistent with the evidence in the record. The regulations also clearly indicate that ability to work determinations are reserved for the Commissioner:

> We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

20 C.F.R. § 404.1527(e)(1). Thus, an ALJ "will not give any special significance to opinions on issues reserved to the Commissioner." *Jarvis v. Comm'r of Soc. Sec.*, 2009 WL 649655, at *4 (S.D.Ohio March 9, 2009) (citing 20 C.F.R. § 404.1527(e)(2)). After four examinations over a four month period, Dr. Beasley diagnosed the plaintiff with OCD, major depressive episode, Dysthymia, anxiety, obesity and venous stasis. (Tr. 381-84.) The symptoms/side effects of the plaintiff's

-22-

depression, anxiety, and "motoric slowing" increased from "mild" to "high" and Dr. Beasley adjusted her prescribed dosage of Zoloft from 25mg to 100mg. *Id.*

Dr. Beasley examined the plaintiff nearly five months later on January 17, 2002, and her diagnosis remained relatively unchanged. (Tr. 402.) Dr. Beasley noted that the plaintiff's "obsessive and compulsive symptoms" had decreased and assigned her a GAF score of 60. (Tr. 402-03.) The plaintiff returned to Dr. Beasley on April 11, 2002, and reported having "a lot of fatigue." (Tr. 398.) Dr. Beasley noted that the plaintiff's "affect is just a bit brighter than it was on the last occasion," and that "her thoughts are well organized." (Tr. 399.) Yet, even though the plaintiff showed slight signs of improvement, Dr. Beasley assigned her a GAF score of 42. (Tr. 400.) On July 11, 2002, Dr. Beasley indicated that although the plaintiff's "mood is mildly down," her "affect is a bit brighter than on last visit." Dr. Beasley's diagnosis and treatment plan remained unchanged, and again she assigned the plaintiff a GAF score of 42. (Tr. 405-07.)

The ALJ correctly noted that there was minimal objective evidence to support Dr. Beasley's diagnosis and that the prescribed treatment plan did not comport with the GAF scores she assigned the plaintiff. (Tr. 26.) The plaintiff's treatment plan remained relatively unchanged even though her GAF score dropped from 60 to 42, and there was a two to three month gap in between her examinations. (Tr. 398-408.) Dr. Beasley's assessments were also contradicted by Dr. O'Brien's mental status examination (Tr. 323-27), and by Dr. Sachs's and Dr. Walker's mental RFCs. (Tr. 345-46, 372-74.) Although Dr. O'Brien diagnosed the plaintiff with an "Adjustment Disorder with Depressed Mood" and "Borderline Intellectual Functioning," he did not assign any significant limitations to the plaintiff's ability "to sustain concentration, remember simple instructions, make plans independently of others, maintain basic standards of neatness/cleanliness, socially interact on

-23-

a repeated basis, accept instruction/criticism from others, work with others, or in her ability to manage funds." (Tr. 326.)  Dr. Sachs concluded that the plaintiff could "perform simple and low level determined tasks over [a] full work week" (Tr. 347), and Dr. Walker noted that even though the plaintiff would have difficulty working with the general public, she could "understand/recall/perform low-level detailed instructions [and] sustain concentration, persistence and pace with occasional lapses." (Tr. 374.)  Therefore, the ALJ correctly determined that Dr. Beasley's medical evaluations did not deserve controlling weight since her findings were not supported by clinical or laboratory tests, or substantial evidence in the record. (Tr. 26.)

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .'" Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original).  The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)).  The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).  The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

The ALJ focused on the factors of frequency of treatment, supportability of the medical opinion, and consistency of the medical opinion with the record in granting "[l]ittle weight" to Dr. Beasley's medical reports. (Tr. 26.)  The ALJ asserted that Dr. Beasley's assessment "is a statement of ultimate conclusion of inability to work" and inconsistent with the other mental health evidence in the record. *Id.*  The ALJ also found:

> Particularly, when the claimant was initially seen in September 2000 (her first psychiatric treatment and post decision), her diagnosis was Mood Disorder and Global Assessment of Functioning of 60/60 or top of moderate according to Dr. Beasley.  In January 2001, the diagnosis was malingering with mild problems with anxiety and a focus on obtaining disability.  The Global Assessment of Functioning assigned at that time was 65/65, or some mild limitations.  When seen May 2, 2001, the claimant was estimated to have only "slight" impairment in her level of functioning, with depression and anxiety in the "moderate" range.  On April 11, 2002, Dr. Beasley reports a current Global Assessment of Functioning of 42 with high and low of 42 and 30, respectively, with the preceding 6 months.  Those notes, however, offer practically no objective support for the diagnoses reached or for the Global Assessment of Functioning estimate.  It is of some significance that Dr. Beasley's physician's statement of March 27, 2002, indicates diagnoses of Major Depression, Recurrent superimposed on Dysthymia and Obsessive-Compulsive Disorder and discloses that the claimant had not been seen since January 17, 2002, or more than two months prior.  Similarly, the Physician's Statement of September 4, 2002, from Dr. Beasley reveals nearly two months since the patient was last seen.  This level of care is not consistent with the Global Assessments of Functioning assigned by Dr. Beasley.

*Id.* (Citations to exhibits in the record omitted.)  Dr. Beasley's assessment of the plaintiff was not supported by objective medical evidence and was inconsistent with the medical evidence in the record.  Furthermore, her prescribed treatment for the plaintiff over the eighteen month period was conservative, subject to minimal variation, and did not support her overall conclusion that the plaintiff was unable to work. *Id.*  The ALJ provided "good reasons," as required by Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), for awarding

-25-

"[l]ittle weight" Dr. Beasley's assessment of the plaintiff (Tr. 26) and substantial evidence in the record supports that determination.

### 2. The ALJ did not err in analyzing the plaintiff's subjective complaints of pain

The plaintiff argues that the ALJ erred in evaluating the credibility of her subjective complaints of pain caused by post-phlebitic syndrome. Docket Entry No. 11, at 12. Although the ALJ did not specifically reference post-phlebitic syndrome in his decision, he did address the plaintiff's "leg pain" and "poor circulation." The ALJ concluded that "the record as a whole does not support the claimant's allegations of symptoms, including pain, as to preclude her ability to perform at least light work activity for a continuous period of at least 12 months" and that there was "no objective basis" to explain the plaintiff's allegations of pain. (Tr. 25.)

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision on credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F. 3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F. 3d at 1036). Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186 at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at 5. The ALJ must explain his

-26-

credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the Social Security Administration ("SSA") and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[19] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong has two parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)). The SSA also provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c).[20] The ALJ cannot ignore a plaintiff's statements

---

[19] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n. 2.

[20] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms.

-27-

detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2).

There is objective medical evidence of the plaintiff's underlying physical medical condition of post-phlebitic syndrome. Exhibit A to Docket Entry No. 11. This objective medical evidence satisfies the first prong of the *Duncan* test. However, there is little or no objective medical evidence confirming the pain that the plaintiff attributed to this condition. The Sixth Circuit has noted that "[w]ithout such evidence, this Court will generally defer to the ALJ's assessment." *Hash v. Comm'r of Soc. Sec.*, 309 Fed. Appx. 981, 990 (6th Cir. Feb. 10, 2009) (citing *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir.1990) ("deferring to the ALJ's credibility analysis where there was no objective medical support to confirm the disabling effects of claimant's underlying medical condition")). The ALJ concluded that objective medical evidence did not support the plaintiff's complaints of pain, and that there was "insufficient evidence since July 2000 to establish limitations related to poor circulation . . . ." (Tr. 25.)

The plaintiff acknowledges that the ALJ discussed her allegations of "muscuosketeal pain," but did not address her "problems due to [] post-phlebitic syndrome."[21] Docket Entry No. 11, at 12.

---

[21] The ALJ noted that

> [a]lthough the claimant complains of pain, there is no objective basis to explain her symptoms. X-rays dated March 2000 and July 2000 showed that a fracture of the right ankle had completely healed. An x-ray of the right knee in July 2000 showed minor spurring with no other abnormalities. An x-ray of the right ankle in July 2000 showed some midfoot spurring and possible demineralized bones. At the consultative examination performed in October 2000, there was mild to moderate tenderness of the cervical and lumbosacral spine, left shoulder, hips, and right ankle with mildly decreased range of motion.

(Tr. 25.)

-28-

She specifically alleges that the ALJ failed to consider Dr. Stewart's restriction that she needed to have "almost constant heel over heart elevation." Docket Entry No. 17. Yet the plaintiff only refers to part of Dr. Stewart's treatment notes from July 24, 1998, in which he opined that the plaintiff "needs to have either almost constant heel over heart elevation *or* at least constant compression hose during the day." *Id.* (Emphasis added.) Dr. Stewart advised the plaintiff to wear the compression hose "all day long, every day" and noted that although she experienced tingling and numbness, she did not have any pain. *Id.* At the hearing, the VE testified that the plaintiff's ability to work would be eliminated if she had to elevate her feet above her heart three to four times a day. (Tr. 76.) When read as a whole, Dr. Stewart's treatment note does not require heel over heart elevation since he also proposed the option of compression hose.

Dr. Dittes diagnosed the plaintiff with post-phlebitic syndrome twice (Tr. 294, 301), and Dr. Edwards and Dr. Gomez both diagnosed the plaintiff with edema, a condition associated with post-phlebetic syndrome. (Tr. 314, 320, 329-30.) Dr. Edwards explained to the plaintiff that it was important for her to see her physician "for this condition," but did not prescribe a treatment plan. (Tr. 314.) After determining that the plaintiff had a "2 + pitting brawny pedal edema bilaterally," Dr. Gomez concluded that in an eight hour workday she could lift 20 pounds occasionally, and that she could stand/sit at least six hours with normal breaks. (Tr. 330.) The record contains no other medical evidence pertaining to the plaintiff's post-phlebitic syndrome or edema. Three weeks after Dr. Gomez's assessment, Dr. Perry conducted a physical RFC on the plaintiff and determined that she could lift/carry 10 pounds frequently and 20 pounds occasionally, stand/walk and sit about six hours in an eight hour workday, and was not limited in her ability to push or pull. (Tr. 349-56.) Given Dr. Stewart's compression hose treatment option, and the physical evaluations conducted by

Case 3:04-cv-00966   Document 21   Filed 08/11/09   Page 29 of 32 PageID #: 32

Dr. Gomez and Dr. Perry, there is substantial evidence in the record to support the ALJ's finding that plaintiff's subjective complaints of pain did not preclude her from working.

### 3. The ALJ correctly determined that the plaintiff did not suffer from mild mental retardation

The plaintiff alleges that the ALJ failed to properly consider the IQ scores assigned to her by Dr. O'Brien. Docket Entry No. 11, at 11-12. On October 2, 2000, Dr. O'Brien performed a consultative mental status examination and found the plaintiff to have a Full Scale IQ score of 69, a verbal IQ score of 73, and a performance IQ score of 70 on the WAIS-III. (Tr. 325.) However, even with these I.Q. scores, Dr. O'Brien opined that the plaintiff's "lack of educational opportunity and adaptive functioning argues against a diagnosis of Mild Mental Retardation." *Id.* He further stated that the plaintiff did not seem to be "significantly impaired in her ability to sustain concentration, remember simple instructions, make plans independently of others, maintain basic standards of neatness/cleanliness, socially interact on a repeated basis, accept instruction/criticism from others, work with others, or in her ability to manage funds." (Tr. 326.) This was the same rationale used by the ALJ to explain why he did not find the plaintiff's IQ scores to be indicative of mild mental retardation. (Tr. 23.)

For the plaintiff to be characterized as mildly mentally retarded and disabled under the regulations, she must meet the criteria of Listing 12.05C. *See* 20 C.F.R. 404, Subpart P, Appendix 1, § 12.05C. Listing 12.05C provides that

> [m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period (before age 22). A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and

-30-

significant work-related limitation of function. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

* * * *

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

*Id.* The plaintiff must satisfy not only the specific requirements set forth in paragraph C, but also meet the criteria in the introductory paragraph. *Russell v. Astrue*, 2008 WL 5130103, at *2 (E.D. Tenn. Dec. 4, 2008) (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (holding that "[a] claimant must demonstrate that her impairment satisfies the diagnostic description for the listing in order to be found disabled thereunder")). Therefore, to demonstrate a claim of disability under Listing 12.05C, the plaintiff must prove that she exhibited "significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested during the developmental period (before age 22)," present "[a] valid verbal, performance, or full scale IQ score of 60 through 70," and demonstrate a "physical or other mental impairment" that significantly limits her ability to work. *Russell*, 2008 WL 5130103, at *2 (citing *West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir. July 5, 2007)); 20 C.F.R. 404, Subpart P, Appendix 1, § 12.05C.

Even if the ALJ accepted the validity of the plaintiff's 2002 IQ scores, the plaintiff would not meet the listing of 12.05C. The record does not establish that the plaintiff has been intellectually challenged for the duration of her life and thus she does not meet the introductory listing requirement that mental deficits have manifested before the age of 22. (Tr. 253-54.) The plaintiff's school records indicate that she withdrew from school during her seventh grade year at the age of 16, and that she was absent from school for 86 days that year. (Tr. 254.) The plaintiff was also absent from school for 83 days during fifth grade and for 48 days during sixth grade. *Id.* The

-31-

plaintiff's marginal grades could have been due to her significant number of absences. There is also no indication that the plaintiff was placed in a special education curriculum or that testing was performed to determine the existence of a potential mental impairment. Given that the record does not support a finding that the plaintiff was functioning at a subaverage intellectual level before the age of 22, the introductory requirement of Listing 12.05C is not satisfied and the plaintiff cannot be considered mildly mentally retarded in accord with the regulation.

## V. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 10) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

-32-